# United States District Court

SEALED DOCUMENT PURSUANT
TO E-GOVERNMENT ACT OF 2002

_____ Western _____  **DISTRICT OF** _____ **Texas** _____

UNITED STATES OF AMERICA

V.

**Christopher Harold TAPPIN**  &  **CRIMINAL COMPLAINT**
**Robert CALDWELL**

CASE NUMBER:   SA-07-50-(1,2)M

Filed 1/26/2007
Clerk, U. S. District Court
Western District of Texas
By _____
                              Deputy

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief.  Beginning on or about **December 13, 2005** and continuing until, and including **January 25, 2007**, in **El Paso** county in the **Western** District of **Texas**, and **elsewhere** defendant(s) did, knowingly and willfully combine, conspire, confederate and agree with persons known and unknown to export articles classified under the International Traffic in Arms Regulations, to wit: Hawk Missile System Batteries (Eagle Picher Brand GAP 4328 Zinc/Silver Oxide reserve batteries), without first having obtained a license from the U.S. Department of State, Office of Defense Trade Controls

in violation of Title **22**  United States Code, Section(s) **2778**  and Title **18** United States Code Section **371**;

I further state that I am a **U.S. Immigration and Customs Enforcement Special Agent**  and that this complaint is based on the following facts:

## See Attached Affidavit

Continued on the attached and made a part hereof:    X    Yes _____ No

_____
Signature of Complainant
Ronald Marcell, Special Agent

Sworn to before me and subscribed in my presence,

January 26  , 2007                                   at  San Antonio, Texas
Date                                                        City and State

JOHN W. PRIMOMO U.S MAGISTRATE JUDGE     _____
Name & Title of Judicial Officer                         Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ronald O. Marcell, a Special Agent with the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE"), having been duly sworn, do hereby depose and state as follows:

1.     I make this affidavit in support of a criminal complaint against Robert CALDWELL ("CALDWELL") and Christopher TAPPIN ("TAPPIN"). I believe probable cause exists to believe that CALDWELL and TAPPIN have: (1) conspired to knowingly and willfully export Hawk Missile batteries, defense articles, from the United States to the Netherlands or the United Kingdom, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of the Arms Export Control Act codified at 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3), and Title 18, United States Code, Section 371; and (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the Netherlands or United Kingdom to Iran, Hawk missile batteries, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls (DDTC), in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1); and (3) aided and abetted these offenses in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(d) and 18 U.S.C. § 2.

1

2.       I submit this affidavit for the limited purpose of obtaining a criminal

complaint. This affidavit sets forth only those facts and circumstances necessary to

establish probable cause for the issuance of the requested criminal complaint. This

affidavit does not contain every material fact that I have learned during the course of this

investigation. The information contained in this affidavit is based on my own personal

knowledge and investigative efforts and information provided to me by other United

States law enforcement officials during the course of this investigation.


3.       I am a Special Agent with the U.S. Department of Homeland Security, U.S.

Immigration and Customs Enforcement, Office of Investigations, El Paso, Texas. I am

currently assigned to conduct investigations involving illegal exports and have served in

this position since September 2005. My current responsibilities include investigating the

illegal transfer of commodities, information, and services from the United States, which

are regulated by the U.S. Departments of State, Commerce, and the Treasury. Prior to my

appointment with ICE, I was a Supervisory Senior Inspector and Senior Inspector with

the Immigration and Naturalization Service for approximately five years. During that

time, I was responsible for the supervision and directing of investigations involving

violations of federal law.


4.       The Arms Export Control Act ("AECA"), as codified at 22 U.S.C. § 2778,

2

regulates the export from and import into the United States of defense articles and services. Specifically, 22 U.S.C. § 2778 authorizes the President to perform three functions: (1) to designate those items which shall be considered as defense articles and services, which will constitute the U.S. Munitions List; (2) to require licenses for the export of such articles and services; and (3) to promulgate regulations for the import and export of such articles and services.

5.     The U.S. Department of State, Directorate of Defense Trade Controls ("DDTC"), promulgates regulations under the AECA, which are known as the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130. The ITAR contains the U.S. Munitions List ("USML"), which sets forth twenty-one categories of defense articles and services that are subject to export licensing controls.  Unless an exemption applies, the ITAR requires a validated export license for the export of U.S. Munitions List articles and related technical data to all destinations. Specifically, section 127.1(a)(1) of the ITAR states, in pertinent part, that it is unlawful to " . . . reexport or retransfer or attempt to reexport or retransfer from one foreign destination . . . by anyone of any U.S. origin defense article . . . for which a license or written approval is required by this subchapter without first obtaining the required license."  Further, section 127.1(a)(3) sets forth that it is illegal for anyone to "conspire to export, import, or cause to be exported, imported or reexported, any defense article . . . for which a license is

3

required . . ." In addition, section 127.1(d) of the ITAR specifies that no person may willfully cause, or aid, or abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by 22 U.S.C. § 2778, or any regulation, license, approval, or order issued there under.

6.     22 U.S.C. § 2778(b)(2) states, in pertinent part, that "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter." Further, 22 U.S.C. § 2778 specifies that it is unlawful for individuals to engage in the business of brokering foreign or domestic defense articles with respect to their export or transfer from the United States without authorization in the form of a license issued by the United States Government. Brokering includes financing, transporting, freight forwarding, or taking any other action that facilitates the manufacture, export, or import of a defense article or defense service.

7.     Conspiracy to commit offenses or defraud United States in violation of Title 18, United States Code, Section 371 states that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any

agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

8.     The Zinc/Silver Oxide Reserve Battery, P/N GAP 4328, Hawk Missile batteries that CALDWELL and TAPPIN are attempting to acquire, are classified as defense articles and subject to the International Traffic in Arms Regulations, and are categorized as significant military equipment on the U.S. Munitions List, category IV(h) (Launch Vehicles, Guided Missiles, Ballistic Missiles, Rockets, Torpedoes, Bombs and Mines.  All specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in this category.)  As such, these items require authorization in the form of a license issued by DDTC for their lawful export from the United States.

9.     This investigation has revealed, as more specifically set forth below, that TAPPIN, CALDWELL and others: (1) conspired to knowingly and willfully export Zinc/ Silver Oxide reserve battery PN/GAP-4328, Hawk Missile batteries, defense articles, from the United States to the United Kingdom or the Netherlands, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls; (2) knowingly and willfully attempted to export from the United States and re-export and

5

re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom or the Netherlands to Iran, Zinc/Silver Oxide reserve, Hawk Missile batteries, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls; and (3) aided and abetted these offenses.

10.     On or about April 13, 2006, an individual (now a cooperating defendant ("CD"), who owns and operates an export business based in Cyprus, contacted an Immigration and Customs Enforcement (ICE) undercover company (UCC) through e-mail, requesting a quote for the purchase of Yardney 329A batteries.

11.     ICE Special Agents (S/As) contacted Yardney Electronic Corporation ("Yardney"). Yardney officials informed S/As that the Yardney type 329A battery was manufactured for the U.S. Army Hawk Air Defense Missile and used the National Stock Number (NSN) of 1420-00-484-8556. Yardney officials informed S/As that they have received inquiries for these batteries from non-governmental individuals before, but the inquiries normally ended when Yardney requested an end-user statement from the intended purchasers. ICE S/As also learned that a company by the name of Eagle Picher manufactured the same type of battery using the same NSN 1420-00-484-8556, but Eagle Picher uses an internal part number of GAP-4328.

12.     ICE S/As requested a license determination for the Zinc/Silver Oxide Reserve Battery, P/N GAP 4328, Hawk Missile batteries from the United States State Department Office of Defense Trade Controls (ODTC).  The United States Department of State (ODTC) stated that the Hawk Missile batteries were licensable for export under the United States Munitions List (USML) under Category IV(h) Launch Vehicles, Guided Missiles, Ballistic Missiles, Rockets, Torpedoes, Bombs and Mines.

13.     On April 18, 2006, ICE S/As acting in an undercover capacity contacted the CD and asked the CD how controlled the batteries were.  On April 18, 2006, the CD replied with the following e-mail:

"I am going to answer the question in a roundabout way.  My initial view was that they were very controlled and we would be unable to get a quote because as can be seen below we initially went to Yardney direct and was told what you see in the e-mail history under the quote-unquote below.  However it is interesting that export paperwork as going to be done by them once we produced our friendly nation end user.  Anyway we did get a quote using an American company that may have been able to get the quote on the back of the fact that they have a military supplies arm to their organization (we were actually dealing with the commercial side).

7

14.    The CD continued to communicate with the undercover ICE S/As concerning the purchase of the Yardney Type 329a batteries including the possibility of the UCC selling the CD the Eagle Picher brand of batteries instead of the Yardney brand. The CD told the UCA that his customer preferred the Eagle Picher batteries. The UCA and the CD agreed on the price of $5,000.00 USD for each Eagle Picher brand GAP-4328 battery.

15.    On August 9, 2006, an ICE S/A acting in an undercover capacity met with the CD in New York, New York, and spoke with the CD concerning two separate matters The first was the export of a U.S. Commerce licensable item, the next were the Eagle Picher GAP 4328 batteries. The CD told the ICE S/A that they could sort things out and get the wire transfer. The CD then told the ICE S/A that Christopher TAPPIN would then send someone to pick up the U.S. Commerce licensable item and the Eagle Picher GAP 4328 batteries.

16.    On August 10, 2006, the ICE S/A acting in an undercover capacity again met with the CD in New York. The purpose of the meeting was to demonstrate the U.S. Commerce licensable item and show the CD the Eagle Picher GAP 4328 batteries. The ICE UCA showed the Eagle Picher GAP 4328 batteries and demonstrated a U.S.

Commerce licensable product for the CD. The CD then spoke with the ICE S/A and told the ICE S/A that when the batteries are shipped out, the ICE S/A should label them as "commercial batteries" to avoid problems exporting the batteries.

17.    On August 11, 2006 the CD was arrested, and agreed to cooperate with S/As. As a result of the CD's arrest, the five Eagle Picher GAP 4328 batteries were not delivered. On August 28, 2006, during a follow up interview, the CD revealed several individuals he was working with to secure the U.S. Commerce licensable item, and the Eagle Picher GAP 4328 batteries. The CD told S/As that he was purchasing the batteries for a long time Iranian Customer on behalf of an Iranian company based in Tehran, Iran. The CD provided S/As access to his business computer and provided the Purchase Order listing the Zinc/Silver Oxide Reserve Battery, P/N GAP 4328, Hawk Missile batteries as spare parts, and shipping instructions to go by Iran Air Cargo in Amsterdam airport, on a Freight Collect basis. The CD also provided several e-mails between the CD and the Iranian and the CD and an individual in the United Kingdom by the name of Christopher TAPPIN, detailing the negotiations and the intended purchase of the Hawk Missile Batteries. Prior to this interview, the UCA had no dealings with either TAPPIN or the Iranian customer.

18.    During interviews with the CD, the CD was asked what role TAPPIN had in

the purchase of the batteries, and the CD stated the he had initiated a company with
TAPPIN. The name of the company was Monarch International Limited. This
information was corroborated by a copy of a Certificate of Incorporation from the
Commonwealth of the Bahamas naming the CD and Christopher Harold TAPPIN with a
date of birth of ██████████████, and listing an Address of █████████████████
████████████████████. This certificate also listed TAPPIN as the
Director of BROOKLANDS FREIGHT SERVICES LTD and BROOKLANDS
OVERSEAS SERVICES LTD. The CD told S/As that Monarch International Limited
was initiated by the CD and TAPPIN to establish business in the Middle East, including
in Iran. The CD told S/As that he was making the arrangements for the purchase of the
batteries, and that TAPPIN would have made the arrangements for the shipping of the
batteries. The CD told S/As that he had spoken to TAPPIN about the purchase of the
batteries and that TAPPIN was to receive fifty percent of the profit on the sale of the
batteries.

19.    The CD informed S/As that the shipment route for the batteries would be
from the United States to Amsterdam, Netherlands then on to Iran. The CD stated that
neither he nor TAPPIN wanted the batteries to land in the United Kingdom prior to being
transshipped to Iran. The CD stated that the United Kingdom would have a problem with
military equipment being exported from the United Kingdom to Iran. Computer files

provided by the CD illustrated that the CD and TAPPIN have used this same route on

prior illegal export of U.S. technology to Iran.   The computer files provided by the CD

included e-mails between the CD and TAPPIN, emails between the CD, TAPPIN, and a

freight forwarding company in Amsterdam. Also found were airway bills indicating the

U.S. technology was received by the freight forwarding company in Amsterdam and then

shipped to Iran, as well as letters of credit from Iranian banks indicating the requirements

for payment to the beneficiaries.


    20.    In an e-mail sent to TAPPIN at ~~Tapping~~ on

May 20, 2006, the CD wrote;

        Dear Chris,

        As promised in our telecom please find the update.

        As we get things into shape each list will follow on and so any updates will

        be explained as we go.  Until we reach that stage there may be some items

        on list you have that you wish to question more.  Let me know if that is the

        case.


Attached to this e-mail was a computer file labeled Enquiry-Quote log-Chris 2-5-06.pdf.

This computer file contained a summary of the enquiries that the CD had previously

obtained; most of the inquiries were from companies in Iran.   One of the entries on the

11

summary was labeled; Enquiry No.  E1025-06, Date of Enquiry:  03/06/2006, Country: Iran, Customer Name: M.Babaie, Enquiry Product Description: Batteries, Remarks: These are special batteries that we tried to get last year from manufacturer.  We have a price from (name of ICE undercover company).  I spoke with Ali on 2/5/06  (May 2, 2006) and told him cost was 8,000 USD and selling price should be less than original but around 14,000 USD each for Qty 20.  I await customer view before we see what will happen. The CD informed S/As that this summary list was to inform TAPPIN of pending orders and that the CD followed up with several telephone calls to TAPPIN to discuss these orders.

21.    Following the CD's arrest on August 11, 2006, the UCA continued a dialogue with individuals from BROOKLANDS in the United Kingdom attempting to finalize shipping of the U.S. Commerce Department licensable item.  The UCA was attempting to further the investigation and stalling to conceal the CD's arrest.

22.    Thereafter, on October 2, 2006, an individual identifying himself as Ian PULLEN of BROOKLANDS INTERNATIONAL FREIGHT contacted the UCA.  The person identifying himself as Ian PULLEN asked the UCA if the CD had discussed the purchase of the "batteries" with the UCA.  The UCA told PULLEN that the CD had discussed them with the UCA, but that the batteries had not been paid for at this time.

12

PULLEN told the UCA that his customer now wanted the batteries that the CD had previously seen. PULLEN told the UCA that he (PULLEN) needed information on the price for five batteries. PULLEN asked the UCA if the UCA could send an e-mail to PULLEN at ████████ The UCA agreed. The UCA also asked for a telephone number where the UCA could call PULLEN. This call was recorded. PULLEN provided a telephone number of (████████ (This is the same number that the UCA later used to speak with TAPPIN. This number is also a number that the CD provided S/As as TAPPIN's telephone number). On November 16, 2006, the recorded telephone call was played for the CD, and the CD identified the voice on the telephone as that of Christopher TAPPIN. The CD based this identification on his knowing TAPPIN for over 20 years.

23.    On October 2, 2006, the UCA wrote TAPPIN an e-mail at ████████ addressing the e-mail to PULLEN. The e-mail explained that the price for the batteries is $5,000 (USD), and that the original order was for five units. The UCA also wrote that there were a total of 10 batteries available. The UCA wrote that he was waiting for his contact to return to the New York City warehouse, since the battery shipment was very sensitive.

24.    On October 11, 2006, the UCC was called by an individual identifying himself as Christopher TAPPIN of BROOKLANDS INTERNATIONAL FREIGHT.

TAPPIN was requesting dimensions for a U.S. Commerce licensable item, and concerning the purchase of the Hawk Missile batteries.  The UCA told TAPPIN that the purchase price would be around $5,500.00 for each battery.  TAPPIN ordered a total of five batteries and agreed to pay $25,000.00 for this order.  TAPPIN agreed and told the UCA that this was a "done deal".  The UCA explained to TAPPIN that the batteries needed to be repackaged to verify there were no military markings on the boxes.  TAPPIN told the UCA that the batteries would be a recurring purchase.  TAPPIN provided the following address as the shipping address:  BROOKLANDS INTERNATIONAL FREIGHT SERVICES, ███████████████████████ United Kingdom.  TAPPIN then told the UCA that the normal time frame for wire transfers was ten days but he (TAPPIN) would rush this transfer.

25.    On October 13, 2006, the UCC bank account was credited $24,980.00 USD. The transfer was from a London bank.

26.    On October 18, 2006, TAPPIN called the UCA and told the UCA that he (TAPPIN) had sent the $25,000.00 USD.  TAPPIN asked the status of a previous purchase that TAPPIN had made from the UCC.  TAPPIN also asked if the UCC's freight forwarder had shipped that previous purchase.  The UCA told TAPPIN that he understood that TAPPIN's freight forwarder would ship that purchase and that the UCC's

14

freight forwarder would ship the batteries because the batteries were U.S. Department of

State licensable.  TAPPIN told the UCA that he wanted the UCC's freight forwarder to

ship both items.  TAPPIN told the UCA that he wanted the purchases sent to separate

countries.  TAPPIN told the UCA that he wanted the batteries forwarded to SENATOR

INTERNATIONAL B.V. ████████████████████, The Netherlands.

TAPPIN then told the UCA that he wanted the previous purchase to be sent to him

(TAPPIN) in the United Kingdom.  The UCA asked TAPPIN for a purchase order for the

batteries and asked TAPPIN to describe the batteries in a manner of his choosing.  The

UCA told TAPPIN that the UCA would provide two invoices, the first would  read Hawk

Missile system batteries so TAPPIN could provide that to TAPPIN's end user.  The

second invoice would read whatever TAPPIN wanted it to read as described on his

pending purchase order.  The UCA told TAPPIN that the second invoice would

accompany the batteries in the shipment.


27.    On October 19, 2006, an ICE UCA placed a telephone call to TAPPIN.

The UCA told TAPPIN that he (UCA) had a problem, the UCA told TAPPIN that the

UCC bank had contacted the UCA concerning the wire transfer of $24,980.00 that

TAPPIN had sent for the batteries.  The UCA told TAPPIN that the bank requested

approval for the return of the wire transfer to TAPPIN, the UCA went on to tell TAPPIN

that he (UCA) did not approve the return of wire transfer.  TAPPIN told the UCA that he

(TAPPIN) asked his bank whether or not the wire transfer could be reversed. TAPPIN had then called his bank and told the bank to stop the reversal. The UCA asked TAPPIN if he wanted to continue the transaction with the batteries, and TAPPIN stated he did. TAPPIN told the UCA that he talked about the reversal because he has not received the airway bills for the two items he has paid for. TAPPIN told the UCA that he will be placing more order for the batteries once the other batteries are shipped. The UCA asked TAPPIN if he will want those batteries shipped to Amsterdam as well, and TAPPIN told the UCA yes. The UCA told TAPPIN that he did not normally conduct these types of transactions without first meeting the people. TAPPIN told the UCA that he knew that the CD and the UCA's business partner had met. The UCA told TAPPIN that this is why he is proceeding. TAPPIN told the UCA that he wanted the UCA to understand that he would be needing a total of 35 batteries. The UCA also requested a purchas order for the batteries. The telephone call then ended.

28.     On October 19, 2006, the UCC received an e-mail from ████████████
The following is a rendition of that e-mail:

> UCA,
>
> Further to our telecon please see attachment P/O (Purchase Order) for
>
> above. Please arrange to airfreight shipment to Amsterdam. Consignee:
>
> Senator International B.V. ████████████████████████████████

16

The Netherlands.  Regards Ian PULLEN

The attached purchase order was addressed to the UCC and dated September 22, 2006.

The purchase order showed that a total of 5 GAP 4328 INERT Batteries were being

ordered (GAP 4328 is the part number assigned by the manufacturer of the Hawk Missile

batteries.  INERT as used with this battery, means that the battery chemicals have not yet

been activated and thus have a longer storage life).  The purchase order was signed using

the name of the CD who was arrested on August 11, 2006.


29.    On October 25, 2006, the UCC received an e-mail for ███████████████

The e-mail requested information on the shipment of the items TAPPIN had requested.

The e-mail was signed Ian PULLEN.


30.    On October 26, 2006, a freight forwarder, sent TAPPIN a Shippers Export

Declaration (SED) showing the U.S. Commerce Department licensable item that the CD

was shown in New York and purchased by TAPPIN and the CD was being shipped.  The

freight forwarder also sent a SED directly to SENATOR INTERNATIONAL B.V., Attn:

Hans reflecting that the batteries were shipped.  The SED sent to SENATOR

INTERNATIONAL B.V listed the batteries not by their true name and part number but

rather as other primary cells and primary batteries.

31.    On October 26, 2006, under the direction of ICE S/As, a Customs and Border Protection (CBP) Officer (CBPO) sent TAPPIN a notice of detention and seizure for the U.S. Commerce Department licensable item being sent to TAPPIN, and a notice of detention and seizure to SENATOR INTERNATIONAL B.V. for the batteries being sent to SENATOR.

32.    On November 1, 2006, under direction of ICE S/As the CBPO placed a consensually monitored telephone call to TAPPIN requesting information on the items that TAPPIN was listed as the ultimate consignee.  The CBPO asked TAPPIN who the end user of the product was and if it was licensable to export from the United States. TAPPIN replied that he did not know if it was licensable that was up to the U.S. supplier, but TAPPIN would worry about British Customs.  TAPPIN then told the CBPO that this item was being sent to an Oil Company in Norway for surveillance, however he would e-mail the CBPO the end user information.

33.    On November 1, 2006, under the direction of ICE S/As, the CBPO sent an e-mail to SENATOR INTERNATIONAL B.V.  addressed to Hans SCHOUTE.  The e-mail explained to SCHOUTE that SENATOR was listed as the ultimate consignee for the batteries shipment and that CBP needed to know who the end user was and if the batteries were licensable for export under U.S. or Dutch laws.  On November 2, 2006, SCHOUTE

replied to the CBPO and stated that he would get with the supplier and return the details.

34.    On November 08, 2006, SHOUTE responded to the request by CBP by simply forwarding the e-mail SHOUTE received from TAPPIN.  In TAPPIN's e-mail, TAPPIN instructed SHOUTE to inform CBP that the batteries were being purchased by a chemical company in the Netherlands to be used for electroplating.

35.    The UCA advised TAPPIN that U.S. Commerce Department licensable item and the Eagle Picher GAP 4328 batteries were still being held by CBP until CBP's investigation was complete.

36.    Thereafter, on December 20, 2006, TAPPIN told the UCC that TAPPIN's U.S. agent  would be contacting the UCC to assist in the export of the Eagle Picher GAP 4328 batteries because TAPPIN was still needing them.

37.    On December 20, 2006, and individual identifying himself as Robert CALDWELL contacted the UCA concerning the export of the Hawk Missile batteries. CALDWELL informed the UCA that he was a U.S. agent of Brooklands Freight and was contacting the UCA on behalf of TAPPIN.

38.   The UCA informed CALDWELL that the batteries that TAPPIN purchased were licensable and that the UCA had previous problems exporting the Hawk Missile batteries.   CALDWELL told the UCA that he was unaware of any of the licensing issues, but that he would contact TAPPIN concerning this export.  The UCA told CALDWELL that the UCA would prefer selling the batteries directly to CALDWELL as a domestic sale, and CALDWELL agreed.

39.   On December 20, 2006, CALDWELL wrote an e-mail to the UCA from e-mail address ███████████████   In the e-mail, CALDWELL informed the UCA that CALDWELL was a U.S. Agent for various Brooklands business affairs.  CALDWELL also informed the UCA that he owned his own company and that he conducted domestic procurement and exports from his office.  CALDWELL provided his telephone numbers and  address as follows: Robert CALDWELL, ██████████████████ Oregon 97209, telephone ████████ and fax █████████

40.   On December 26, 2007, CALDWELL wrote an e-mail to the UCA from e-mail address ██████████████   In the e-mail, CALDWELL informed the UCA that he was interested in meeting with the UCA at the UCA's earliest convenience.

41.   On December 28, 2006, a telephone call was placed to CALDWELL by the

UCA. CALDWELL told the UCA that he had spoken with TAPPIN and that both

CALDWELL and TAPPIN wanted to complete the purchase of the batteries by January

2007 so they could send them out by January.  The UCA agreed and asked CALDWELL

if TAPPIN had explained the sensitivity of the batteries.  CALDWELL stated that

TAPPIN had explained that the batteries were sensitive.  CALDWELL told the UCA that

everything has to be done very business like.  CALDWELL told the UCA that he wanted

protect the UCA and the UCA's company.  CALDWELL told the UCA that any details

on this would be very helpful.  CALDWELL told the UCA that he wanted to know how

the UCA wanted this done and how the UCA wanted this to work.  The UCA told

CALDWELL that a domestic sale would be best for the UCA to prevent any issues

coming forth.  CALDWELL told the UCA that he understood fully.  CALDWELL told

the UCA that he and TAPPIN have worked business deals with a freight forwarder in San

Antonio, Texas previously, but that he needed to explain that to the UCA in person.


     42.     On January 3, 2007, a telephone call was placed to CALDWELL by the

UCA. The UCA informed CALDWELL that he was going to send a proforma invoice

(PI) and the UCA was going to list this sale as a domestic sale in case the UCA's

company was inspected.  The UCA asked CALDWELL if CALDWELL wanted the UCA

to double invoice this sale, meaning that he send an invoice for CALDWELL for his

records and one for the UCA's records showing a domestic sale.  CALDWELL told the

UCA it sounded as if the UCA was experienced in that so he would have to agree with the UCA's instructions. The UCA again asked if CALDWELL wanted this sale double invoiced, and CALDWELL agreed stating that it sounded like a good idea. The UCA explained to CALDWELL that the UCA has to pay several thousands of dollars because of the items being seized in New York, New York.

43.     The UCA requested that CALDWELL return a purchase order (PO) for the sale for the UCA's records. CALDWELL told the UCA that he would be speaking with TAPPIN that evening concerning the order. The UCA told CALDWELL that if CALDWELL wanted to repackage the boxes the batteries were in then it was up to CALDWELL to do so. CALDWELL asked if that was something that TAPPIN had spoken about. To this, the UCA told CALDWELL that TAPPIN was aware of the repackaging. The UCA told CALDWELL that he was invoicing the batteries at the agreed upon price of $1,000.00 USD each on the PI. CALDWELL agreed. The UCA told CALDWELL that he would send one PI for the real value of the batteries, and one with the devalued amount. The UCA told CALDWELL that he was doing this as not to raise any red flags.

44.     On January 4, 2007, a PI was sent to CALDWELL indicating 5 GAP 4328 inert batteries; the type and number of batteries requested by TAPPIN. On the invoice

was the following warning; "Export of the commodities described herein is strictly

prohibited without a valid export license issued by the U.S. State Department, Office of

Defense Trade Controls, prescribed in the International Traffic in Arms Regulation

(ITAR), Title 22 Code of Federal Regulations, Part 120-130."

45.     On January 8, 2007, an ICE UCA received a telephone call from TAPPIN.

TAPPIN asked the UCA if he had resolved the problems with Customs concerning the

batteries.  TAPPIN told the UCA that he had received the PI from CALDWELL and that

CALDWELL would have full details on how to move the batteries.  TAPPIN told the

UCA that he was concerned about the fine the UCA was being assessed by Customs, and

the product that Customs was holding.  The UCA told TAPPIN that he was going to have

to pay the fine and then would be meeting with CALDWELL.  TAPPIN also told the

UCA that he wanted batches of 5 batteries each after this initial sale.  TAPPIN told the

UCA that if the other item he was purchasing needed a license to export, the he would

provide the end user statement for that item, but the batteries would be sent through

CALDWELL.

46.     The UCA asked TAPPIN if CALDWELL would be fully aware of the

shipping instructions of the batteries and TAPPIN told the UCA that he was.  TAPPIN

asked the UCA about the price for the next battery purchase.  TAPPIN asked the UCA to

lower the cost for the batteries since the fine was not going to be as high as anticipated. TAPPIN also told the UCA that CALDWELL would be paying the $5,000.00 USD for the current battery order to cover the fines.

47.     On January 10, 2007, the UCA called CALDWELL and left a message and later received a return telephone call from CALDWELL. The UCA asked CALDWELL if he would be sending the purchase order (PO) for the batteries he and TAPPIN were ordering.  CALDWELL told the UCA that he was working on the PO with TAPPIN. CALDWELL stated he had some problems with some information in the body of the PI provided by the UCA.  CALDWELL expressed concern to the UCA regarding the export warning.  However, CALDWELL stated that he had already spoken to TAPPIN, to which TAPPIN and CALDWELL agreed that everything should be okay.  CALDWELL told the UCA that there was a problem with the shipping information on the PI, stating that the PI showed San Antonio, Texas as the shipping destination, when it should be Houston, Texas.  The UCA told CALDWELL that this would not be a problem.  CALDWELL also requested the shipping dimensions of the batteries.

48.     On January 10, 2007, CALDWELL sent an e-mail to the ICE UCC from e-mail account ████████████.  The e-mail came with an attachment named RC Purchase Order BRK 2565.doc.  The e-mail informed the UCA that CALDWELL was

attaching the invoice for the first 5 batteries. The attached invoice listed CALDWELL as

the purchaser, the ICE UCC as the vendor, and a shipping address for a freight forwarder

in Houston, Texas. The invoice indicated a quantity of five batteries, and described the

batteries as "Tideland Gap inert non-spillable reserve batteries and packaging as per

agreement". The price listed $1,000.00 USD per battery.


49.    Arrangements were made for the UCA and CALDWELL to meet in San

Antonio, Texas to further discuss the sale of the batteries. On January 23, 2007,

CALDWELL told the UCA that he would be arriving in San Antonio, Texas and would

be staying at the Emily Morgan Hotel in San Antonio, Texas. On January 24, 2007,

CALDWELL was surveilled by ICE S/As arriving at the San Antonio, Texas Airport.

CALDWELL was identified by a photograph obtained by ICE S/As. ICE S/As also saw

CALDWELL checking into the Emily Morgan Hotel in San Antonio, Texas.


50.    On January 25, 2007, CALDWELL and the UCA met in San Antonio,

Texas to further discuss the export of the Zinc/Silver Oxide Reserve Battery, P/N GAP

4328. During this meeting, CALDWELL paid the UCA the agreed $5,000.00 in the

form of a personal check made payable to the UCC. During the conversation with the

UCA, CALDWELL admitted that he was having the batteries exported from the United

States, and that he was not going to obtain the U.S. State Department ODTC license that

was required.  At this time, CALDWELL was arrested by ICE S/As.  At the time of

CALDWELL's arrest, CALDWELL was in possession of several documents relating to

the purchase and export of the batteries he was purchasing from the UCA.

51.    CALDWELL was provided a warning of rights statement and after reading

and stating he understood his rights, CALDWELL waived his right to remain silent and

agreed to answer questions without an attorney present.  CALDWELL told S/As that he

was told by TAPPIN that the batteries he was purchasing were  for navigational systems,

and that they were dual use items.  CALDWELL admitted that he was aware that the

batteries he was purchasing from the UCA required a license.  CALDWELL also

admitted that he was going to send the batteries to Houston, Texas as directed by

TAPPIN.  CALDWELL then told S/As that he knew that batteries would then be

exported from the United States without the required license.  CALDWELL told S/As

that he knew it was illegal to do this, but did not know the consequences.

52.    After CALDWELL was informed of his rights, CALDWELL gave consent

to ICE S/As to search the hotel room at the Emily Morgan.  CALDWELL also agreed to

allow ICE S/As to look through the documents he was in possession of at the time of his

arrest.  Several of the documents were correspondents between CALDWELL and

TAPPIN, and CALDWELL and the UCA.  On the proforma invoice that the UCC sent

CALDWELL was an asterisks next to the warning, informing CALDWELL that exporting the batteries without a valid license was illegal. CALDWELL told S/As that he was aware of this fact and spoke with TAPPIN concerning the exportation of the batteries, and TAPPIN informed CALDWELL that the batteries had a dual use. After the interview, CALDWELL was booked into the San Antonio Detention Center.

53.    According to DDTC records, the below listed commodity that TAPPIN and CALDWELL are attempting to acquire are classified as defense articles and subject to the ITAR. More specifically, the following items are categorized as significant military equipment on the U.S. Munitions List, category IV(h) (Launch Vehicles, Guided Missiles, Ballistic Missiles, Rockets, Torpedoes, Bombs and Mines. All specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in this category.), and as such, require authorization in the form of a license issued by DDTC for their lawful export from the United States.

- Zinc/Silver Oxide Reserve Battery, P/N GAP 4328

54.    On or about January 18, 2007, an ICE Special Agent contacted the Department of State, Office of Defense Trade Control (ODTC), in Washington, DC and requested a license history check on TAPPIN and CALDWELL. The ODTC advised that neither TAPPIN nor CALDWELL have ever applied for, a license to export Eagle Pitcher

27

Zinc/Silver Oxide Reserve batteries; part number GAP-4328 from the United States. The ODTC also informed ICE S/As that CALDWELL is not registered with the ODTC to procure or export USML items.

55.     Based on all of the forgoing, I believe there is probable cause to believe that Robert CALDWELL, Chris TAPPIN, and others, have: (1) conspired to knowingly and willfully export Hawk Missile batteries, defense articles, from the United States to the United Kingdom, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls, in violation of the Arms Export Control Act codified at 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3), and 18 U.S.C. § 371; (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom (or Netherlands) to Iran, Hawk Missile batteries, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1); and (3) aided and abetted these offenses in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(d) and 18 U.S.C. § 2.

Special Agent Ronald O. Marcell
U.S. Immigration and Customs Enforcement,

U.S. Department of Homeland Security

SUBSCRIBED and SWORN before me this 26th day of January 2007.

HONORABLE JOHN W. PRIMOMO
United States Magistrate Judge

29